Cite as 2023 Ark. App. 19

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-22-55

| | | |
|---|---|---|
| JESSICA HAYES | | Opinion Delivered January 25, 2023 |
| | APPELLANT | |
| | | APPEAL FROM THE SEBASTIAN |
| V. | | COUNTY CIRCUIT COURT, FORT |
| | | SMITH DISTRICT |
| WILLIAM HAYES | | [NO. 66FDR-18-468] |
| | APPELLEE | |
| | | HONORABLE ANNIE POWELL |
| | | HENDRICKS, JUDGE |
| | | |
| | | REVERSED |

## RITA W. GRUBER, Judge

Appellant Jessica Hayes appeals from an order of the Sebastian County Circuit Court finding her in contempt of court orders incorporated into the parties' divorce decree that required the parties to keep the children in a proper and wholesome environment, to enjoin and restrain them from making derogatory comments about the other parent in the presence of the children, and to, in good faith, endeavor to maintain in all the children respect and affection for the other party. On appeal, Jessica argues that the finding of contempt is not supported by the evidence and that the circuit court erred by not dismissing the contempt on the affirmative defenses of unclean hands and estoppel. We reverse.

Jessica and appellee William Hayes married in 2002 and have two children—Minor Child 1 (MC1), born in 2005; and Minor Child 2 (MC2), born in in 2010. The parties

divorced on December 31, 2018. Jessica was awarded sole legal and physical custody of the children, and William was awarded visitation according to the court's standard visitation order. The divorce decree incorporated the parties' property-settlement and separation agreement as well as the court's standard order regarding visitation and related matters. The property-settlement agreement contained the following provision: "The Wife and Husband shall at all times in good faith endeavor to maintain in all the children respect and affection for the other party." The standard order contained the following provision: "Welfare of Children: The children are to be kept in a proper and wholesome environment at all times. Both parties are enjoined and restrained from making derogatory remarks about the other parent in the presence of the child or children, and from allowing others to do so."

On June 21, 2021, William filed a motion for contempt alleging he married his girlfriend on June 4, and MC1 was invited to attend but declined. MC1 arrived at the "scene" of the wedding with Jessica. MC1 posted a "Snap" on Snapchat from the car that stated, "[T]his may be really unhealthy but my dads getting married [right now] and instead of going to the wedding me, my mom and I are sitting outside the church waiting for them to leave so we can see how trashy her dress Is." William alleged that this was an example of an "ongoing and systematic effort" on Jessica's part to alienate the affections of the children from him and, further, that Jessica "has improperly endorsed and approved, in concert, bad and hurtful conduct on the part of [MC1] towards her father." In addition to asking that a civil fine be imposed, William asked the court to fashion a punishment to remedy this particular situation. He also sought costs and fees associated with the contempt action.

In her answer, Jessica admitted that MC1 had arrived at the wedding with her but denied the remaining allegations. She affirmatively pleaded that she has not tried to alienate the children from their father but that William's relationship with the children is strained because of his own actions and asked the court to order William to attend joint counseling sessions with the children to help mend their relationships. Jessica also raised the defenses of estoppel and unclean hands.

A hearing took place on September 16, at which time MC1 was sixteen and MC2 was ten. William testified that the divorce decree required that he not expose the children to his girlfriend—now wife—and their child for 180 days. He continues to maintain a separate home across the street from his home that he shares with his new wife and child so that MC1 and MC2 have no contact with his new wife and their child, who was three at the time of the hearing. He acknowledged that he allows the children to choose not to spend time in the presence of his wife and child. He is required to pay for counseling for the children, which he thought would help the children adjust to the changes in their lives and accept their new sibling and anticipated marriage to his girlfriend. Despite participation in counseling individually and with the children since the 2018 divorce, he did not think counseling had helped the children adjust to his marriage and new child. William believes there is a conflict of interest because MC1 uses the same counselor as Jessica and asked that MC1 have an independent therapist.

William learned of MC1's Snapchat post the day after his wedding. He felt extreme hurt, sadness, and frustration that his daughter would behave that way, and he was angry

with Jessica for "being a part of it, allowing it, [and] facilitating it." He reached out to Jessica by text. Jessica responded that she does not communicate with him by text and wrote, "If you ever took the time to have authentic conversations with, and actually listen to your daughter, you would know there was a strain on this entire time. You can blame me all you want, but everyone recognizes the truth, and it's that none of this is my fault." William said that he is limited to communicating with Jessica by email or phone call.

On cross-examination, he acknowledged that Jessica has an issue with texting because she believes his wife reads them and that he can call Jessica anytime. William testified that since the parties separated, MC1 and MC2 had been in counseling because of his affair and the marital breakdown. He explained he had not had many joint sessions because he could not dictate that his daughters speak to him but said he would be there when requested. He never asked Jessica for help in facilitating counseling because he could do it himself.

William testified that he wants MC1 to accept his new wife and child but admitted that he maintains separate houses and separate times with MC1 and MC2, explaining that he kept the marital home in the divorce and purchased the house across the street where he resides with his new family. The children have been invited to the new home but do not want to go, and he cannot force MC1 to be around his wife. William attends MC1's games only when they occur during his visitation because MC1 does not want his wife and their child to attend. He acknowledged that his wife expects him to be home outside his set visitation because there can be no "crossing" of the two families. He can communicate with the children anytime as they both have cell phones, and Jessica had never withheld visitation.

William claimed that Jessica was alienating him from MC1 and MC2 "by not fostering an environment that allows inclusivity with his current wife and child" but admitted that he had the same responsibility and a had better ability to do so than Jessica.

MC1 testified outside the presence of her parents. In regard to the Snapchat post at issue, she was outside the church where her father was getting married when she posted it. Although she was invited, she chose not to attend the wedding. She explained she had been at dinner beforehand with her mother, her mother's friend, and MC2, and it was a "spur of the moment" decision for her to go.[1] She had driven herself to dinner and could have driven home, but she wanted to see who was there. Although MC1 regretted the post, she did not regret going with her mom. She did not feel it was a "safe" place for her to be at the wedding, clarifying for the court that it would not be good for her mental health to see her father get married. MC1 said that there was a discussion in the car about wanting to see how "trashy" the wedding dress was, but that was not the entire reason for going. MC1 said her mom was not invited to the wedding but wanted to see who was there "to know . . . who she could trust." MC1 said that her mom does not bring up her dad and his new wife unless

---

[1]Upon questioning by the court, MC1 indicated that she was a passenger in the car with her mother, MC2, and her mom's friend, Gabby Devero, who was driving. The court asked whether Gabby is Ed Devero's daughter and whether Ed and his wife knew that their daughter was with them on this "adventure." MC1 replied that Gabby is their daughter but did not know if they knew she was with them that day. The court stated, "I bet they didn't. Can't imagine it." During Jessica's testimony, the court asked about Gabby's age. Jessica stated that she is twenty-eight and considered her part of her family in a lot of ways.

MC1 brings it up. MC1 has no desire to have a relationship with her half sister but said that her mother does not mind if she does.

On cross-examination, MC1 said that she has told her dad she does not want a relationship with her half sister because "seeing her reminds me of everything that happened . . . his affair and when everything fell apart." She blames her dad for the divorce, but he has been "understanding throughout it and willing to accept that." MC1 testified that she likes her therapist whom she has seen since her parents divorced. Although her mom also sees the same therapist, MC1 said the therapist never talks to her about what her mom says in therapy. She had only gone to counseling with her dad a couple of times, and although he mentioned going, he never pushed it. She explained that they discussed how much time he spends with them and that he only spends time if it during his visitation, indicating that the sessions end with him saying that "nothing could change." MC1 indicated that her father won't come to her games outside of his set visitation because his new wife will not give up that time because MC1 will not spend time with her. MC1 said her dad rarely misses visitation but said that there are times when she or her sister had to go with a friend or a grandparent because an event would exceed his visitation time.

The court questioned MC1 about her refusal to be around her dad's new wife and child, stated that MC1 is basically making him choose between his two families, and suggested that it would be easier and healthier if they could all get along and be in the same place. The court stated that it had been three years since MC1's parents divorced, and things should be getting smoother at this point. The court went on to tell MC1 that "[m]y parents

did the same thing when I was about thirteen and so I know exactly how that feels. But at some point you've got to let things go and try to work towards everyone getting along and be in the same place." After MC1's testimony, William rested. Jessica moved for directed verdict, stating that she did not feel William had met his burden of proving that she had been in willful violation, and the court denied the motion.[2]

Jessica testified in her defense. In regard to why she went to the wedding although she had not been invited, she explained:

> So, over this last year I've had to cut several people out of my life because I learned that they were still having various relationships with my ex-husband. And after everything that the girls and I have been through over the last few years, it ~ I try to keep everything separate. And so, to be completely frank, I was curious about who was there so that I would know who else I needed to cut out of my life.

She said that the children chose to go with her, indicating that they know nothing about their father's other life and were curious, especially MC2. Jessica thought it would be helpful for everyone if William would go to therapy with the children more often. She encourages them to see their dad as often as they can, expressing that it is important to her for them to have a healthy relationship with him. Jessica stated that there are times when William will not keep the children past his visitation time, even for an hour. Jessica did not have any issues seeing the same therapist as MC1 and thought it worked well for everyone because

---

[2]The court responded, "Oh, I absolutely do," and denied the motion, noting that Jessica had taken her kids because she wanted to know whom she could trust. The court then commented, "Are you kidding me? I'm not going to say this on the record in front of this mom, but are you kidding me?"

MC2's therapist is in the same building, and it gives the therapist a "full picture" of what has and is happening in their family.

On cross-examination, Jessica said that taking her children with her on the day of the wedding was a "bad parenting moment." She explained that she did so because there was a "curiosity on everyone's part. There was also some closure that happened just by seeing that after three and a half years it was over." She agreed that it probably sent a message to the children "on some level" about her attitude towards their father but indicated that was not what was wrong with their relationships. Jessica acknowledged that she does not want to communicate with William by text because, at one point, his then girlfriend (now wife) had responded on his phone and made rude comments.

At the conclusion of the hearing, the circuit court found Jessica in contempt, orally ruling in part as follows:

> The Court is making a finding that the plaintiff is in contempt of this Court. Her candid testimony today is a clear picture of that. It was her idea to take her minor daughters to the wedding of their father, and the reason she went to the wedding was to cut off who else she needed to cut out of her life, people that continued to have a relationship with the defendant need to be cut from her life. That is a clear contemptuous behavior. It's appalling. If my jail wasn't so full I might even put her in there. And so full of COVID. Just appalling behavior. Bad parenting.

The court further spoke to Jessica, stating that the next time she decides to involve her children, she needed to "go talk to [her] counselor first and see if she thinks it's a good idea. . . . Because this was . . . the worst thing I've heard in a couple of years, honestly, to do to your kids, your poor daughters. And I can't believe - - if Ed Devero and his wife knew that Gabby did this, I cannot believe they would approve of that behavior either."

8

The court entered an order on July 22, 2021, finding in part the following:

IV

That, furthermore, the Court incorporated the Standard Order Regarding Child Visitation and Related Matters which was attached to the aforesaid Decree and which provides: "The children are to be kept in a proper and wholesome environment at all times. Both parties are enjoined and restrained from making derogatory remarks about the other parent in the presence of the child or children and from allowing others to do so." That, moreover, the parties entered into a Property Settlement and Separation Agreement which was filed herein on December 31, 2018. That, in the aforesaid Agreement, the parties agreed to the following: "The Wife and Husband shall at all times in good faith endeavor to maintain in all the children respect and affection for the other party."

V

That, since the entry of the aforesaid Divorce Decree which incorporated the terms of the parties' Property Settlement Agreement, the plaintiff has conducted herself in a manner in which this Court finds to be in violation of the Orders and directives of the Court and which are contemptuous of the aforesaid Orders and directives of this Court.

The court ordered that the parties communicate by text and that MC1 continue counseling with a new counselor who is not shared with, or connected to, Jessica. In addition, Jessica was ordered to pay William $1000 for reimbursement of his attorney's fees incurred in pursuit of the contempt action. Jessica timely appealed.

Contempt is a matter between the judge and the litigant and not between the two opposing litigants. *Holifield v. Mullenax Fin. & Tax Advisory Grp., Inc.*, 2009 Ark. App. 280, at 3, 307 S.W.3d 608, 610. Willful disobedience of a valid order of a court is contemptuous behavior. *Rye v. Rye*, 2021 Ark. App. 286, 625 S.W.3d 761. Before one can be held in contempt for violating the court's order, the order must be definite in its terms and clear as

to what duties it imposes. *Id.* Contempt can be civil or criminal. *Id.* The purpose of criminal contempt is to preserve power, vindicate the dignity of the court, and punish for disobedience of the court's order. *Id.* Civil-contempt proceedings are instituted to preserve and enforce the rights of private parties to suits and to compel obedience to orders made for the benefit of those parties. *Id.* If contempt is civil in nature, as it is here, the standard of review is whether the circuit court's finding is clearly against the preponderance of the evidence. *Id.* A finding is clearly against the preponderance of the evidence if, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *Potter v. Holmes*, 2020 Ark. App. 391, 609 S.W.3d 422.

In her first two points on appeal, Jessica contends that the circuit court's contempt finding is not supported by sufficient evidence. First, she argues that there is a lack of a clear order: a wholesome environment or promoting affection at all times cannot require perfect parenting, and her actions were not a willful violation of the court orders. Second, she contends that the contempt finding is against the weight of the evidence in part because the circuit court disregarded or ignored the circumstances of Jessica and the children and relied on her opinion and personal relationships with others.

The orders at issue in this case require the children to be kept in a proper and wholesome environment at all times and require the parents to, in good faith, endeavor to

maintain in all the children respect and affection for the other party.[3] The parties do not cite any contempt cases in Arkansas, nor did our research reveal any contempt cases addressing the general orders at issue in this case. These general types of directives have come up in cases involving modifications of custody or visitation, which this case does not. This case is clearly distinguishable from other domestic-relations cases in which contempt has been upheld for violations of specific orders related to visitation, payments, or maintenance of health insurance. *See, e.g., Evans v. Carpenter*, 2022 Ark. App. 83, 642 S.W.3d 235; *Williams v. Lofton*, 2018 Ark. App 606, 569 S.W.3d 872; *Bass v. Bass*, 2011 Ark. App. 753, 387 S.W.3d 218.

The situation here involved an isolated incident—Jessica taking her daughters with her to watch from outside William's wedding. Although William's contempt petition alleged that the wedding incident was an example of an "ongoing and systematic effort" on Jessica's part to alienate the affections of the children from their father, the circuit court's ruling that found Jessica in contempt was based on the wedding incident. These orders on which the court found Jessica in contempt related only to the parties, not third parties, such as William's new wife. The Snap posted by MC1 was directed at the new wife, and neither Jessica nor William was aware of the Snap until the day after it was posted. Based on the

---

[3]The divorce decree also enjoined and restrained the parties from making derogatory remarks about the other parent in the presence of the children. We note that there have been cases involving contempt based on a parent making a derogatory comment about the other parent in the presence of the children. *See, e.g., Byrd v. Vanderpool*, 104 Ark. App. 239, 290 S.W.3d 610 (2009). This case, however, does not involve Jessica making a derogatory comment about William in front of the children.

evidence presented, William appears to have a good relationship with his children. While the children refuse to be around William's new wife and child, this is a choice that he has admittedly allowed and perpetuated by continuing to maintain separate houses and spending time with MC1 and MC2 only during his scheduled visitation.

As stated previously, contempt is not a matter between two opposing litigants but a matter between the judge and the litigant. Whatever may be taking place between the parties should not be the subject of a contempt proceeding unless the court has clearly and unequivocally ordered a party to do or not to do some specific thing. *Holifield*, *supra.* While the orders at issue fail to support the alleged contemptuous behavior in this case, we are not holding that these type of orders, which are common in many domestic-relations cases, could not support a finding of contempt in an appropriate case. Rather, the specific facts in this case do not support a violation of the orders relied on by the circuit court.

In conclusion, we are left with a definite and firm conviction that a mistake has been committed. The record in this case does not support a violation of the orders at issue. Further, although we reverse the circuit court's contempt finding, we in no way condone Jessica's admittedly poor-parenting decision. Inasmuch as Jessica challenges the sufficiency of the evidence to support the contempt order on the basis that the circuit court relied on improper considerations and judgments, we do not reach this argument because we hold

that the record does not support a violation of the orders at issue.[4] For the same reason, we need not address Jessica's arguments related to the defenses of unclean hands and estoppel.

Reversed.

WOOD and HIXSON, JJ., agree.

*Dusti Standridge*, for appellant.

*Gean, Gean & Gean*, by: *Roy Gean III*, for appellee.

---

[4]While we do not reach the merits of appellant's argument, we note that the circuit court made a number of concerning comments on the record.